In the

# United States Court of Appeals
### For the Seventh Circuit

———————

No. 16-2234

JOHN SIMPSON,

*Plaintiff-Appellant,*

*v.*

BROWN COUNTY, *et al.,*

*Defendants-Appellees.*

———————

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:13-cv-01660-TWP-TAB — **Tanya Walton Pratt**, *Judge.*

———————

ARGUED FEBRUARY 14, 2017 — DECIDED JUNE 26, 2017

———————

Before ROVNER, WILLIAMS, and HAMILTON, *Circuit Judges.*

HAMILTON, *Circuit Judge.* This appeal presents a classic test
of procedural due process. As the case comes to us, we must
assume that a county board revoked a man's professional li-
cense without giving him prior notice or an opportunity to be
heard.

The case arises from Brown County, Indiana, where the rolling hills and brilliant fall foliage draw over a million visitors each year, and where the natural beauty has been the subject of countless paintings, including those of T.C. Steele, a noted American Impressionist. Rural Brown County is home to just about 15,000 residents, or fewer than fifty people per square mile. With such a sparse population, most families and businesses depend on septic systems to dispose of wastewater. Plaintiff John Simpson installed and repaired septic systems in the county until June 14, 2013, when his license to do so was revoked by the Brown County Board of Health.

Simpson then brought this action under 42 U.S.C. § 1983 against Brown County, the Brown County Health Department, and the Brown County Board of Health (collectively, "the County"). Simpson alleged he was deprived of property without due process of law and sought compensatory damages for his loss of income. After prolonged procedural fencing over the pleadings, the district court dismissed Simpson's operative complaint under Federal Rule of Civil Procedure 12(b)(6). The district court's theory was that post-deprivation remedies under state law, such as common-law judicial review, satisfied the Fourteenth Amendment's due process requirement and that Simpson had not availed himself of such remedies. Simpson appeals that decision. Taking Simpson's allegations as true, we hold (1) that Simpson has plausibly alleged that he was denied the pre-deprivation notice and hearing he was due; and (2) that even if the evidence ultimately shows the County had some basis for summary action, the County has not shown there is an adequate post-deprivation remedy under state law, whether in the form of common-law

judicial review or anything other. We reverse and remand for further proceedings.

I.    *Factual and Procedural Background*

Plaintiff John Simpson owns Monroe, LLC, a septic installation company based in Brown County. Simpson previously held a license to install and repair septic systems. He was told his license was revoked in a letter sent by County Health Officer Paul Page on June 14, 2013.

Two weeks earlier, on May 31, 2013, Page had sent Simpson a corrective action letter demanding that he immediately repair the septic system on Simpson's mother's property. In that letter, Page threatened that if Simpson did not make the necessary repairs to the septic system, Page would request legal action through the county prosecutor's office and "may request an executive meeting of the Health Board to recommend that [Simpson's] license to install septics be rescinded." Without apparent further process or an opportunity for Simpson to be heard, Page followed through on that threat with his June 14 letter: "Based on the findings our Health Board members approved the removal of your name from our list of approved septic contractors." The letter did not inform Simpson of any law or regulation he had violated, and it did not identify any opportunities for administrative or judicial review.[1]

---

[1] These letters, surprisingly, were neither appended to Simpson's complaint nor included in the briefing before the district court. At oral argument, we directed the parties to supplement the record on appeal with copies of the letters. The parties jointly submitted the letters, and we treat their submission as a correction by stipulation or pursuant to our inherent authority under Federal Rule of Appellate Procedure 10(e)(2)(A) or (C). See *United States v. Miller*, 832 F.3d 703, 704 (7th Cir. 2016) ("Although litigants generally are not allowed to bypass the district court and present

At the time, septic installation and repair licenses were governed by a county ordinance.[2] The ordinance provided in section 501: "Any person engaged in … the installation or repair of sewage disposal systems within Brown County shall submit an application to the Health Officer to have his name placed on the County Register." The procedures for removal of a septic installer from the register were described in section 503. That section broadly delegated the power of license revocation to the Health Officer, who could remove any person or firm that had demonstrated "inability or unwillingness to comply with these rules and requirements." The affected party could re-apply for a license after one year, and if the Health Officer still deemed him unable or unwilling to "comply," then the installer might be removed from the register permanently.

Simpson brought this suit in October 2013 alleging that his removal from the list of licensed septic installers deprived him of a protected property interest without due process of law. After two rounds of amendments to the complaint, the

evidence for the first time to the court of appeals we've allowed exceptions."). It is particularly appropriate for us to consider the contents of the letters since they are excerpted in Simpson's complaint and are central to his claim. See *Bogie v. Rosenberg*, 705 F.3d 603, 609 (7th Cir. 2013); *Citadel Group Ltd. v. Washington Regional Medical Center*, 692 F.3d 580, 591 (7th Cir. 2012).

[2] While this case was pending in federal court, a related case proceeded in Indiana state court. In 2015, the state court held that the septic ordinance was invalid because it was not properly published. *Brown County Board of Health v. Simpson*, No. 07C01-1312-OV-000873, slip. op. at 5 (Brown Cty. Cir. Ct. Apr. 13, 2015). It appears that the County is currently in the process of enacting a new septic ordinance that complies with the publication requirements of Indiana Code § 36-2-4-8.

district court granted the County's Rule 12(b)(6) motion to dismiss and dismissed the case with prejudice in 2014. Relying on the balancing test from *Mathews v. Eldridge*, 424 U.S. 319 (1976), the district court held that Simpson was not entitled to pre-deprivation remedies because the County's interest in protecting public health outweighed "the potential value of affording [Simpson] additional procedures prior to revocation." *Simpson v. Brown County*, No. 1:13-cv-01660-TWP-TAB, 2014 WL 4840768, at *3 (S.D. Ind. Sept. 29, 2014). The court had erroneously assumed that Simpson had an adequate post-deprivation remedy under Indiana Code § 13-15-7-3, which authorizes the state's Office of Environmental Adjudication to review certain environmental permit revocations. As the district court acknowledged a year later in granting in part Simpson's subsequent Rule 59(e) motion, § 13-15-7-3 has no bearing on a county-level revocation of a septic installer's license. See *Simpson v. Brown County*, No. 1:13-cv-01660-TWP-TAB, 2015 WL 5775513, at *3, 7, 9 (S.D. Ind. Sept. 30, 2015).

The district court corrected its mistake but then held for the first time that Simpson had alleged a "random and unauthorized" deprivation of his license, such that the County had no duty to provide pre-deprivation process. *Id.* at *5. The court granted Simpson leave to amend his complaint again, but only if he could "plead sufficient facts to [show] that he actually pursued all available post-deprivation remedies or sufficiently explain the specific reasons that the available post-deprivation remedies were inadequate." *Id.* at *9.

In his third amended complaint, Simpson cited the septic ordinance, though he had no obligation to do so. See *Johnson v. City of Shelby*, 574 U.S. —, 135 S. Ct. 346, 346 (2014) ("Federal pleading rules call for 'a short and plain statement of the claim

showing that the pleader is entitled to relief'; they do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted.") (citation omitted); *Avila v. CitiMortgage, Inc.*, 801 F.3d 777, 783 (7th Cir. 2015) ("plaintiffs are not required to plead specific legal theories"), citing *King v. Kramer*, 763 F.3d 635, 642 (7th Cir. 2014). Simpson argued that the revocation of his license occurred pursuant to section 503 of the county ordinance and that, far from "random and unauthorized" conduct, the revocation was a "predictable abuse of broadly delegated uncircumscribed power." Simpson argued he was thus entitled to pre-deprivation procedures and received none. Alternatively, Simpson argued that state law afforded him no adequate post-deprivation remedy.

The district court rejected Simpson's arguments, chiding him for "attempting to re-litigate the previously decided issue of pre-deprivation due process" and adding that he failed to plead that he had taken advantage of the one post-deprivation remedy available to him under state law in the form of common-law judicial review. *Simpson v. Brown County*, No. 1:13-cv-01660-TWP-TAB, 2016 WL 1700370, at *4–5 (S.D. Ind. Apr. 27, 2016). The court dismissed the action with prejudice. Simpson appeals.

## II. *Analysis*

We review *de novo* the district court's dismissal for failure to state a claim. *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008). In doing so, we construe the operative third amended complaint in the light most favorable to Simpson, accepting as true all well-pled facts and drawing all reasonable inferences in his favor. *Id.*

Before addressing the substance of the procedural due process issues in this appeal, we pause to address the pleading posture. Though the actions giving rise to Simpson's claim were undertaken by County employees—principally Paul Page and the members of the Board of Health—the defendants in this suit are all County entities (the County itself and its Board of Health and Health Department). Such municipal governments cannot be held liable for damages under 42 U.S.C. § 1983 on a theory of *respondeat superior* for constitutional violations committed by their employees. They can, however, be held liable for unconstitutional municipal policies or customs. *Monell v. Dep't of Social Services*, 436 U.S. 658, 690–91 (1978); *Glisson v. Indiana Dep't of Corrections*, 849 F.3d 372, 378–79 (7th Cir. 2017) (en banc) (explaining theories of *Monell* liability). *Monell* issues have not been part of this appeal thus far; we assume that Simpson is alleging the septic ordinance was unconstitutional, at least to the extent it failed to provide for due process of law, and that he was injured by officials carrying out that ordinance so as to trigger *Monell* liability.

A. *Notice and Opportunity to be Heard Before the Deprivation*

1. *Due Process Basics*

Procedural due process in constitutional law generally involves a familiar line of inquiry: (1) is there a property or liberty interest protected by due process; and (2) if so, what process is due, and when must that process be made available?

Simpson was deprived of a protected property interest. Government-issued licenses to perform certain types of work that allow the license holders to earn their livelihoods are a form of government-created property—an entitlement—and

have long been considered property protected by the Fifth and Fourteenth Amendments. See *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 543 (1985); *Board of Regents v. Roth*, 408 U.S. 564, 577–78 (1972); see also *Barry v. Barchi*, 443 U.S. 55, 64 (1979) ("[I]t is clear that [plaintiff] had a property interest in his license [as a harness-racing trainer] sufficient to invoke the protection of the Due Process Clause."). Our task in this appeal is thus to determine what process was due Simpson, and when.

The general test for determining what process is due and when was set out in *Mathews v. Eldridge*, 424 U.S. 319 (1976). *Mathews* identified three factors to be balanced: first, the private interest at stake; second, the risk of erroneous deprivation and the value, if any, of additional procedural safeguards; and third, the government's countervailing interests. *Id.* at 335. The basic rights guaranteed by constitutional due process are notice of the intended adverse government action and an opportunity to be heard in response, although more elaborate procedural rights—such as the rights to present evidence, to confront adverse witnesses, and to be represented by counsel—may apply in cases in which vital private interests are at risk. See generally *Goldberg v. Kelly*, 397 U.S. 254 (1970). Governments may, of course, offer procedural protections that exceed the constitutional minimum through statute or administrative rule. Many state and local licensing schemes provide procedural protections that are far more elaborate than due process requires.

The *Mathews* balancing test generally requires some process *before* one is deprived of liberty or property. However, the Supreme Court has recognized that due process, "unlike some legal rules, is not a technical conception with a fixed

content unrelated to time, place and circumstances." *Mathews*, 424 U.S. at 334 (citation omitted). The spectrum of due process requirements includes, at one end, a full trial-type evidentiary hearing before a deprivation occurs, as in *Goldberg v. Kelly* (termination of welfare benefits), and at the other end, procedures conducted after summary action has been taken in response to an emergency, as in *Hodel v. Virginia Surface Mining & Reclamation Ass'n,* 452 U.S. 264 (1981) (emergency order to stop mine operations followed immediately by notice and hearing).

### 2. *Random and Unauthorized Deprivations*

The Supreme Court has recognized another special category of deprivations of property or liberty for which pre-deprivation procedures may not be required. In some situations when a government official tortiously deprives a person of property or liberty randomly and without authorization, it is impractical to insist on a pre-deprivation hearing. See *Parratt v. Taylor*, 451 U.S. 527 (1981) (prisoner was deprived of property due to negligence of prison officials, in violation of prison regulations), *overruled in part on other grounds by Daniels v. Williams*, 474 U.S. 327 (1986); *Hudson v. Palmer*, 468 U.S. 517 (1984) (prisoner's property, including legal papers, was intentionally destroyed by guard in unauthorized "shakedown" in his cell). The *Parratt-Hudson* line of cases has a pragmatic foundation. When a person is deprived of property as a result of an unexpected or rogue act, it would be unreasonable to require the government to conduct a pre-deprivation hearing.

Situations involving such random and unauthorized conduct are relatively rare. We do not apply *Parratt* and *Hudson* unless the government "could not predict the conduct caus-

ing the deprivation, could not provide a pre-deprivation hearing as a practical matter, and did not enable the deprivation through established state procedures and a broad delegation of power." *Armstrong v. Daily*, 786 F.3d 529, 544 (7th Cir. 2015). Compare *Veterans Legal Defense Fund v. Schwartz*, 330 F.3d 937, 940 (7th Cir. 2003) ("*Parratt* essentially stands for the rule that when predeprivation hearings are impractical because the actions of the state officers were 'random and unauthorized' the state is only responsible for providing postdeprivation remedies."), with *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 436 (1982) (*Parratt* does not control where "it is the state system itself that destroys a complainant's property interest" without according him "proper procedural safeguards"), and *Zinermon v. Burch*, 494 U.S. 113, 136 (1990) (*Parratt* and *Hudson* do not control where a plaintiff "seeks to hold state officials accountable for their abuse of their broadly delegated, uncircumscribed power to effect the deprivation at issue").

We have, of course, encountered cases in which an alleged deprivation occurred through truly random and unauthorized conduct. E.g., *Leavell v. Illinois Dep't of Natural Resources*, 600 F.3d 798, 805–06 (7th Cir. 2010) (plaintiff alleged that state officials violated unambiguous law requiring notice of hearing concerning closure of oil well); *Schwartz*, 330 F.3d at 941 (defendants acted in a manner "patently inconsistent with Illinois law" by favoring non-veterans over veterans for jobs, even though state law required an absolute veteran's preference in hiring).

However, any license revocation that is "random and unauthorized" will be an aberration. The existence of a license or permit implies the existence of a legal framework with revocation guidelines, even if those guidelines are unduly broad.

To trigger the *Parratt-Hudson* exception in the licensing context, a rogue government official would have to violate the licensing scheme in an unpredictable way. Thus, for instance, in *Easter House v. Felder*, 910 F.2d 1387 (7th Cir. 1990) (en banc), we found the conduct of state licensing officials random and unauthorized where they (1) allegedly conspired to freeze the plaintiff adoption agency's license renewal while expediting its competitor's application, and (2) falsely told third parties (including a state judge) that plaintiff had no active license. The alleged conspiracy, we explained, was "nothing more than a random decision of state employees to disregard state policy and procedure which resulted in injuries to [plaintiff]." *Id.* at 1399. While the licensing officials "did exercise a certain amount of discretion and authority over the failure or success of renewal applications, that discretion was not 'uncircumscribed' or otherwise unregulated." The deprivation the plaintiff complained of was "not one that the state could have predicted or, more importantly, prevented through the implementation of additional predeprivation procedural safeguards." *Id.* at 1401.

The random, rogue behavior by the licensing officials in *Easter House* distinguished that case from *Zinermon*, where the conduct of the state actors in committing the plaintiff for inpatient mental health treatment was "not only 'authorized', but also, under the circumstances of that case, highly 'predictable.'" *Id.* at 1402; see also *Stauch v. City of Columbia Heights*, 212 F.3d 425, 432–33 (8th Cir. 2000) ("The existence of state post-deprivation remedies has been deemed to satisfy procedural due process in situations where the alleged constitutional deprivation was caused by random and unauthorized action. … The actions taken by the City were neither random nor unauthorized and it was certainly feasible for the City to

have provided [plaintiffs] with an opportunity to appeal the [adverse] determination … .").

Simpson's third amended complaint, construed in the light most favorable to him, does not allege "random and unauthorized" actions by County officials. Rather, it alleges official conduct sanctioned by the County. The County had a septic ordinance that plainly described the process for the placement of septic installers on a register and (not so plainly) described the process for their removal. When County Health Officer Page revoked Simpson's license, he acted pursuant to his broadly delegated powers derived from the ordinance. By its terms, the ordinance gave Page as agent for the Board of Health broad discretion to remove any person who had demonstrated "inability or unwillingness to comply" with the ordinance. Page was not acting unpredictably or breaking the rules: he did exactly what the ordinance told him to do. The possibility of license revocation without due process was not unforeseeable. It was authorized in the ordinance itself.

### 3. *Applying Mathews v. Eldridge*

Without the shield of a "random and unauthorized" defense, the County's actions must be evaluated pursuant to the standard *Mathews v. Eldridge* factors: (1) private interest, (2) risk of erroneous deprivation, and (3) state interest.

*Private Interest*. First, the County (like the district court) understates the strong private interest at stake. We must assume that Simpson's ability to earn a livelihood depends on his septic license and that the County's actions deprived him of his livelihood. The weight of the private interest in continued employment "cannot be gainsaid." *Loudermill*, 470 U.S. at

543. The Supreme Court has "frequently recognized the severity of depriving a person of the means of livelihood." *Id.*

In defense of its actions, the County asserts that Simpson could have simply found himself another line of work or pursued septic work somewhere else. If that argument were sufficient, few employees or license-holders would ever have a viable due process claim, for any employer or license-issuer could make that argument. The mere possibility of some other work in some other place must seem cold comfort to Simpson or to others who lose their jobs or professional licenses. "While a fired worker may find employment elsewhere, doing so will take some time and is likely to be burdened by the questionable circumstances under which he left his previous job." *Id.* This is especially true where a license revocation forces a person not only to find a new job but also to transition to a new field.

*Risk of Error*. Next, we consider the risk that, under the established procedures (such as they are), a deprivation might occur erroneously. Here, the septic ordinance vests broad discretion in the County Health Officer to determine when a septic installer demonstrates "inability or unwillingness to comply" with vague "rules and requirements." It does not specify the process by which the Health Officer may remove the installer from the register. Under this ordinance, there is a high risk that someone like Simpson could have his license revoked without so much as a warning, to say nothing of a fair opportunity to be heard. Indeed, taking Simpson's allegations as true (as we must in reviewing the district court's dismissal of his third amended complaint), that is essentially what happened here. Simpson received a vague notice of a problem on his mother's property followed by a notice that his license had

been terminated. There is no indication on the face of the com-
plaint or in the letters from Paul Page that Simpson received
a hearing or was even advised of an opportunity to tell his
side of the story.

We see no reason to believe that the cost of basic proce-
dures (e.g., meaningful notice and an informal hearing)
would be unduly burdensome in comparison with the protec-
tions those additional procedures would provide. See *Mackey
v. Montrym*, 443 U.S. 1, 21 (1979) ("When a deprivation is irre-
versible—as is the case with a license suspension that can at
best be shortened but cannot be undone—the requirement of
some kind of hearing before a final deprivation takes effect is
all the more important.").

*Government Interest*. Finally, the County frames its interest
in public health and safety as paramount. The County is quite
right that public health is "[o]ne of the oldest examples" of a
government interest that can justify summary deprivation of
property. *Hodel*, 452 U.S. at 300 (alteration in original) (citation
omitted) (allowing emergency orders to stop mine operations
to avoid imminent disasters). But to compare the ambiguous
and uncertain septic situation on Simpson's mother's prop-
erty with the collapsing mines in *Hodel* is at best premature.
Brown County has an interest in preventing unqualified indi-
viduals from repairing and installing septic systems. That in-
terest is rooted in its concern for public health and safety. Im-
properly treated sewage, including failed septic systems, is a
leading cause of water pollution in Indiana, and it poses a sig-
nificant risk to public health and the environment. See Con-
servation Law Center & INTERA, Inc., *Water and Quality of Life
in Indiana* 34–35 (2017). But nothing in Simpson's third
amended complaint or in the limited record here suggests that

septic problems associated with Simpson were both so serious and so urgent as to justify summary action by the County, without an opportunity for Simpson to be heard.

On review of a Rule 12(b)(6) dismissal, we must take the truth of the allegations in Simpson's complaint at face value. See *Tamayo*, 526 F.3d at 1081. As alleged, there were no random acts by county officials and no public health emergency. There were only County officials acting pursuant to broadly delegated power. Brown County cannot give its Health Officer unfettered discretion to decide when, how, and why he revokes licenses, and then claim that he was acting so unpredictably that it would be impossible to provide pre-revocation notice. Cf. *Zinermon*, 494 U.S. at 135 ("It may be permissible constitutionally for a State to have a statutory scheme … which gives state officials broad power and little guidance … . But when those officials fail to provide constitutionally required procedural safeguards to a person whom they deprive of liberty, the state officials cannot then escape liability by invoking *Parratt* and *Hudson*."). Under the *Mathews v. Eldridge* balancing test, Simpson has plausibly alleged that he was denied the pre-deprivation process he was due before his license could be revoked.[3]

B.  *Post-Deprivation Remedies*

Perhaps, on remand, facts will emerge that weaken Simpson's claim for pre-deprivation notice and an opportunity to

---

[3] The County implies that Simpson did in fact receive notice and a hearing before his license was revoked. Both in its brief and at oral argument, the County intimated that Simpson received more pre-deprivation process than he has alleged. That issue requires further fact-finding, not a decision on the pleadings.

be heard. To avoid any confusion as this litigation proceeds, we take this opportunity to clarify that common-law judicial review, as described in the cases on which the County relies, could not adequately redress the harm Simpson alleges and therefore would not be a sufficient corrective for a due process violation in the form of a summary license revocation.

In those cases where a plaintiff is not entitled to pre-deprivation process (e.g., where state action is random and unauthorized or where a *Hodel*-type emergency warrants summary action), the Constitution still requires an adequate post-deprivation remedy. Such a remedy need not be identical to the remedy otherwise available under § 1983. In *Parratt*, for instance, the state's tort claims procedure authorized an action against the state alone, not its individual employees, and did not authorize punitive damages or guarantee the right to a trial by jury. 451 U.S. at 543–44. Nevertheless, the "remedies provided could have fully compensated the [plaintiff] for the property loss he suffered," and those remedies were therefore "sufficient to satisfy the requirements of due process." *Id.* at 544; see also *Gable v. City of Chicago*, 296 F.3d 531, 540 (7th Cir. 2002) (state tort remedies were adequate even though they did not provide for attorney fees); *Archuleta v. Colorado Dep't of Institutions*, 936 F.2d 483, 491 (10th Cir. 1991) (discharged employee who was reinstated with back pay and benefits could not bring due process claim for punitive damages and damages for emotional distress; the "fact that plaintiff could obtain more relief under § 1983 does not mean that the remedy for the temporary deprivation of her property was constitutionally inadequate").

Though a state remedy need not match in every respect the relief otherwise available under § 1983, such a remedy

must still offer meaningful redress for the particular injury suffered by the plaintiff. See *Easter House*, 910 F.2d at 1406 (state remedy cannot be "meaningless or nonexistent"). Meaningful post-deprivation remedies are "characterized by promptness and by the ability to restore the claimant to possession." *Baird v. Board of Education*, 389 F.3d 685, 692 (7th Cir. 2004) (breach-of-contract action under state law was inadequate post-termination remedy for former school superintendent who possessed present entitlement to job and who had been afforded only limited pre-termination hearing); see also *Joshua v. Newell*, 871 F.2d 884, 887 (9th Cir. 1989) ("To satisfy due process, the state remedy need not provide the [plaintiffs] with all the relief available under section 1983, so long as it would fully compensate their property loss."); *Wilson v. Beebe*, 770 F.2d 578, 584 (6th Cir. 1985) ("Applying the substantive law of Michigan to [plaintiff's] pendent claim for negligence, the district court awarded [plaintiff] substantial damages. … Though the state remedy did not permit [plaintiff] to recover attorney fees, which would have been available if § 1983 had been the basis of his recovery of damages, this did not render that remedy inadequate.").[4]

---

[4] In *Easter House*, we remarked that "we should not reject the application of *Parratt* unless the remedy which an injured party may pursue in state court can readily be characterized as inadequate to the point that it is meaningless or nonexistent and, thus, in no way can be said to provide the due process relief guaranteed by the fourteenth amendment." 910 F.2d at 1406. But in that case, we identified no fewer than five "potential causes of action, among others," that could have afforded the plaintiff meaningful redress. *Id.* at 1405. If the plaintiff had prevailed on these theories in state court, it could have recovered damages as well as injunctive relief. Our comment about "meaningless or nonexistent" remedies did not suggest that *any* remedy, however limited or removed from the actual harm

In many cases that discuss the adequacy of post-depriva-tion remedies, the underlying conduct of government actors was random and unauthorized within the meaning of *Parratt* and *Hudson*. This should come as no surprise: if a deprivation does not fall within the narrow *Parratt-Hudson* exception, some pre-deprivation process is generally required, as ex-plained above.

In *Gable v. City of Chicago*, for instance, plaintiffs' complaint focused on two categories of random and unauthorized acts: (1) false denials by city employees that plaintiffs' impounded vehicles were stored at a particular lot; and (2) acts of theft and vandalism by city employees. 296 F.3d at 540. Finding that it would "not have been practicable for the City 'to antic-ipate and control in advance' such random acts," *id.*, we turned to the question of post-deprivation remedies. Under state law, plaintiffs could have brought a bailment action to recover compensation for damage to their vehicles as well as compensation for the time their vehicles were wrongfully im-pounded. Thus, a bailment action would have afforded plain-tiffs a "complete remedy." *Id.* Compare, e.g., *Tucker v. Wil-liams*, 682 F.3d 654, 661 (7th Cir. 2012) (plaintiff was not enti-tled to pre-deprivation process because initial seizure of back-hoe satisfied Fourth Amendment; post-deprivation remedy was adequate because plaintiff could have brought suit for conversion or replevin), and *Stork v. McKinley*, 444 F. App'x 920, 922 (7th Cir. 2011) (plaintiff was not entitled to pre-dep-rivation process because alleged deprivation of plaintiff's cash was random and unauthorized; post-deprivation remedy was adequate because plaintiff could have brought claim under

about which the plaintiff complains, will be deemed adequate so as to bar a constitutional due process claim.

Indiana Tort Claims Act), with *Belcher v. Norton*, 497 F.3d 742, 751, 753 (7th Cir. 2007) (plaintiff was not entitled to pre-deprivation process because deputy marshal's actions were random and unauthorized; post-deprivation remedy was inadequate because deputy had acted within the scope of his employment and was therefore immune from tort liability).

Our decision in *Pro's Sports Bar & Grill, Inc. v. City of Country Club Hills*, 589 F.3d 865 (7th Cir. 2009), helps to show the types of post-deprivation remedies that are and are not adequate when the plaintiff alleges an economic injury, as plaintiff Simpson does here. In *Pro's Sports Bar*, a city acted without a hearing to modify a bar's liquor license and to restrict its hours. The city argued that because the bar could have pursued a mandamus action in state court for reinstatement of its old license, it had no valid federal due process claim. We rejected that argument, explaining that unless a state remedy existed that would compensate the bar for its damages, it had no adequate remedy under state law. See *id.* at 872 ("Pro's is asking for more than an injunction compelling the City to issue an unrestricted liquor license. The owners of Pro's seek damages to compensate them for the period of time in which the restricted hours were enforced against them.") (citation omitted).

The reasoning underlying *Pro's Sports Bar*—that a remedy cannot be deemed "adequate" if the plaintiff's injury is financial and the remedy offers no compensation at all—comports with the broader principle that due process "is not a technical conception with a fixed content" but is instead "flexible and calls for such procedural protections as the particular situation demands." *Mathews*, 424 U.S. at 334 (citations omitted).

This principle runs through procedural due process cases decided in this circuit and elsewhere. Compare *Parrett v. City of Connersville*, 737 F.2d 690, 697 (7th Cir. 1984) (former police official had inadequate post-deprivation remedy under union grievance procedure; since arbitrator was not empowered to award full common-law damages, due process required that arbitrator be "able to prevent the harm to the grievant before it occurs, which requires faster action than was taken … in this case"), with *Copsey v. Swearingen*, 36 F.3d 1336, 1343 (5th Cir. 1994) (concessionaire had adequate post-deprivation remedy where stipulation restored concession stand and provided for compensation for intervening period as well as attorney fees), and *Greco v. Guss*, 775 F.2d 161, 172 (7th Cir. 1985) (liquor licensee had adequate post-deprivation remedy where it could have obtained review by state liquor control commission and could have continued serving liquor during pendency of appeal; "since the state procedure would have allowed [licensee] to keep its license until the appeal was decided, [licensee] would have suffered no monetary damages").

The requirement that an adequate post-deprivation remedy for an economic injury must provide some form of compensation parallels the requirement of just compensation under the Takings Clause of the Fifth Amendment. "When the government physically takes possession of an interest in property for some public purpose, it has a categorical duty to compensate the former owner … . Thus, compensation is mandated when [property] is taken and the government occupies the property for its own purposes, even though that use is temporary." *Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency*, 535 U.S. 302, 322 (2002) (citations omitted); see also *First English Evangelical Lutheran Church of Glendale v. County of Los Angeles*, 482 U.S. 304, 321 (1987)

("[W]here the government's activities have already worked a taking of all use of property, no subsequent action by the government can relieve it of the duty to provide compensation for the period during which the taking was effective.").

In the takings context, as in some due process contexts, where the state provides adequate procedures to seek just compensation, a plaintiff must avail himself of those procedures. See *Black Earth Meat Market, LLC v. Village of Black Earth*, 834 F.3d 841, 847 (7th Cir. 2016). But where the state fails to provide such procedures or where the plaintiff is denied just compensation, the plaintiff is then entitled to bring an action under the Takings Clause. See *Williamson County Regional Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 195 (1985) (reasoning by analogy from *Parratt* and *Hudson* that "the State's action is not 'complete' in the sense of causing a constitutional injury 'unless or until the State fails to provide an adequate postdeprivation remedy for the property loss'") (citation omitted); *Harbours Pointe of Nashotah, LLC v. Village of Nashotah*, 278 F.3d 701, 704 (7th Cir. 2002) ("If a state provides adequate procedures for seeking just compensation, a property owner cannot state a claim under federal law until he has used those procedures and been denied compensation.").

As explained above in Part II-A, nothing on the face of Simpson's complaint indicates that the County had a sufficiently urgent interest to justify summary revocation of his license. But even if the County could prove that it had such an interest (or even if the County had afforded Simpson enough preliminary process to get over the pre-deprivation hurdle), it has not shown that any existing state remedy could have made Simpson whole in the event that he ultimately proved the license revocation was wrongful.

Like the plaintiff in *Pro's Sports Bar*, Simpson seeks damages to compensate him for income he allegedly lost when his license was terminated. The County proposes a petition for common-law judicial review, but we are aware of no Indiana case (and the County has cited none) where a litigant obtained damages through such an action. The proposed remedy, in other words, cannot address the harm Simpson claims that he suffered, and it is inadequate on the facts of this case as alleged. Reinstatement of a septic license, like reinstatement of a liquor license, does not address the financial losses resulting from an inability to operate one's business for some length of time.

We are aware of no alternative state remedy that might redress Simpson's injury. The parties agree that he cannot bring a claim under Indiana's Administrative Orders and Procedures Act because the revocation was the act of a county agency, not a state agency. Simpson also cannot bring a tort claim on the basis of a license revocation. See Ind. Code § 34-13-3-3(11) (providing that a governmental entity or employee is not liable for a loss resulting from the "issuance, denial, suspension, or revocation of … any permit, license, certificate, approval, order, or similar authorization, where the authority is discretionary under the law").

Taking Simpson's allegations as true, he has stated a claim for a violation of procedural due process. His septic license was revoked pursuant to a broad delegation that gave county officers the power to act without affording Simpson notice and an opportunity to be heard before the revocation. Moreover, the County has identified no state law remedy (and we are aware of none) that could vindicate Simpson's rights. While discovery may cast new light on the situation, Simpson

is entitled to proceed with his § 1983 claim for deprivation of property without due process of law. We REVERSE the judgment of dismissal and REMAND for further proceedings consistent with this opinion.